My gracious, that was kind of you. You know, we get one life per brief, um, and so we have, um, So, Mr. Lowry. Yes, Your Honor. We are the only appellant raising these challenges, so I am your guide for questions about either of those. Do you want to point me in one direction? Well, you tell me which you would rather lead with, with whether the future releases or the, um, because I, I mean, I can say for myself, um, that it would seem to me that if we say, look, this, this is releasing claims that are based on an identical factual predicate, that to the extent that you're concerned that it does something more, if we construe it as doing that, wouldn't that relieve your concerns? No, Your Honor, because the identical factual predicate limitation doesn't respect the antitrust limitation. To say it more clearly, there are claims that fall within the identical factual predicate doctrine that nonetheless you cannot release as a matter of legislative policy under the antitrust laws. Why do I say that? I say that because Lawler, the Supreme Court, and Riddell's former fifth, which applies Lawler, both involved claims that would have been releasable under the IFP doctrine. They both involved a continuing course of conduct. Lawler even says the fact that the conduct is essentially, wrong page, the fact that the conduct is essentially the same as in the first action does not determine our decision. In Riddell's, it was an ongoing course of price discrimination. And so that IFP limitation, and this is the mistake that district courts have made, respectfully, that IFP limitation stems from due process and notice questions. It does not stem from antitrust policy. It protects the interest of absent class members and not having wholly unrelated claims snatched away from them. On the antitrust side, the legislative policy that you're protecting is in vigorous private enforcement. I want to go with as many of your questions as you have. My time's short, I know. Yeah. We may just have a disagreement about that. But the other issue you wanted to address? Yes. The only thing I would say is if we do have a disagreement on that and you rule that this release can't go beyond the identical factual predicate, please say that in our opinion. Otherwise, you know, we're going to have problems in subsequent cases. On the advocacy side, the problem here is that all of the B-2 class representatives were fully insured, localized health plan subscribers. No one was a national self-insured account like the Home Depot or thousands of other employers who were jammed into this case at the tail end of the negotiations. At the fairness hearing, Subscribers Council, this is day two, page 149, describes those two groups as being in, quote, an entirely different market. And he's right about that. If you look at the district court, the district court approved a separate class for self-insured subscribers, but only on the damages side. And his reasoning is that those, in doing that, he says, the claims of those subscribers arise from conduct specific to that subclass, such as agreements restraining competition in the market for national accounts. Is this going to intra-class conflicts? Because it seemed to me that to the extent your reply brief brought that up, that it was really being raised for the first time in the reply brief. Respectfully, it goes to both to answer the first question. And as to the other, respectfully disagree, Your Honor. I mean, page 21, the bottom, the page at the bottom of the brief, raises this argument very directly. Then if you look at pages 57 to 59, we make our argument and we ground our argument in cases like Amkim and Ortiz that are single class cases. Necessarily, we are arguing about conflicts among class members within a single class, not just conflicts between classes. Stepping back from that also, Your Honor, this is really the last area where you should find a waiver based on a tight reading of the lead brief. The waiver rules in the court are prudential. That's well established under Campbell. And there are multiple Campbell factors that would suggest that you should consider this argument. One is you consider it when there is public interest at stake. Well, here we have the interest of all of the absentees, not simply the Home Depot. And that dovetails perfectly with valid drug where this court held that district courts have an obligation sua sponte to inquire into adequacy, even if no one raises it. And that's not the case here. Public interest is another reason why you should consider this argument. I can't think of a more important. Okay. Mr. Lowery, we've allowed you to go a fair amount over. You've saved a couple minutes for rebuttal. Let's hear from Mr. Smith. Your Honor, there are a couple of others in front of me, but I'll have to go down. Well, you are on the docket next, Valerie. You're representing Employee Service Inc. and Topographic, right? Yes, Your Honor. Okay. Chief Judge Breyer, may it please the court. There are two reasons this class settlement has to be sent back for reallocation. First, the foreshortened claims period is inequitable under Rule 23E. It seemed to me that you confused inequity with equality. No, Your Honor. It requires equitable treatment among class members, and this foreshortened claims period has to be sent back in April 2016. The Blues propounded discovery and depositions to self-funded class members like Regions Bank, and they said at the time that this absent class member discovery was justified by the pleaded scope of the injunctive class action. And they said that that injunction covered all subscribers nationwide, large and small, including self-funded entities. So they took those depositions. They used them to support their summary judgment. And at that time, in April 2016, the operative pleaded injunctive class was identical to the same definition in the first complaint servant. They are the same pleaded injunctive class, and they were aware, they had actual knowledge, that self-funded entities like Regions and Royal Cup in Alabama were in this class. And so you have to take this claims period all the way back to the beginning, four years before servant, because the operative definition of the class is the same. The second reason this court needs to send it back is that the 6.5 percent allocation is also not equitable. Precedent in this court requires the proponents to demonstrate with evidence that, or substantiate a record that shows that this allocation is not inequitable. And that is not in this record. Well, if I understand it correctly, there was an expert, a nationally renowned expert, who used the net revenue framework to determine the allocation, and that there was also evidence that there were other forms of allocation that were presented that actually would have provided one of the subclasses less of a percentage. Is that correct in terms of both the process and the outcome of the other forms or frameworks that could have been used? So my answer will be two-sided, two-parted here. The rule requires front-loading of all the information. That was a post hoc rationalization expert report that was offered in response to our objection, contrary to the amended rule, which requires a solid record up front. Secondly, Dr. Mason did not reveal any of the underlying financial summaries that he relied on. There's simply no data. The district court didn't verify any of those numbers, and this court is unable to verify any of the numbers in Dr. Mason's report because none of those underlying reports were shown. So there's no data apart from the assurances of Mr. Boyce, Mr. Burns, and Mediator Feinberg, and this court in Holmes has said that assurances are simply not enough. The Day case is also like this case. There is simply no data to support this allocation. There's not a single financial record. This case was litigated for 12 years. Over five years was discovery, and there were 75 million documents and financial records of structured data, and none of that is in this record. It was not used to justify the allocation when it was offered, and it was a violation of the rule. All we have left are secrets, the communications between class counsel and Mr. Mason, Dr. Mason, I'm sorry, and then you also have the secret fee allocation, which is a per se violation of Rule 23E3. Let me go back a couple steps. I think I'm reading from your brief, page 23, on the standard of review. Yes, John. Before granting approval of a settlement, a district court must determine that the settlement is fair, reasonable, and adequate after considering several factors, including whether, well, I'm not going to try to read it all. I'm reading very quickly. You wrote it. It goes on and on and on. What is this standard of review? Can you give it a short label? We've heard about abuse of discretion, isn't it? It's the same standard that applied in Holmes and Day, and both of those settlements were reversed. The best statement from this court about the standard is in footnotes 2 and 3 of Johnson v. Enpass. What's the short version? Footnote 2 says that it's a per se abuse of discretion to make a legal error, a procedural error, or a clearly erroneous factual finding, and footnote 3 says this court reviews the federal rules of civil procedure de novo.  We have legal and procedural error in violation of the amended rule, and we have clearly erroneous factual findings because you cannot find any data to justify this 6.5% number that was simply baked in. Is that your top argument on that point, on factual error, is what you just said? No, David. Day and Holmes require an evidentiary record that this court can check. The district court didn't verify 6.5% against any financial record, and this court cannot do so. There is nothing in this record to justify 6.5%. But the judge talked about this in the fairness hearing, right, that he wasn't trying to figure out what was correct or not. It was a settlement, and was there a valid basis for it, a reasonable basis for it? I mean, how does that square with what you just said? Because there's 60 million class members on my side of this class, and they're getting 6% of the money, and there is nothing to check that number against. And Rule 23, as amended, requires the district court to verify equitable treatment between subclasses, and this court has to be able to re-verify. And so when the judge relied on people like Feinberg, who's got a lifetime of experience, and all of these other people, that still wasn't enough? It's not, Your Honor. It's just like the assurances of counsel. You cannot skip past the requirements of the new rule. The assurances of counsel, if anything, reflects the second part of a four-part test that's connected with an and. And so just because the lawyers tell you this is fair, you have to be able to check it because you're adjudicating 60 million of 100 million claims. Well, I mean, so Holmes, I can understand the outcome of Holmes. I mean, you had eight people who got 50% of the settlement agreement and 118 people who got the rest. And from my understanding of Holmes, all you had in the record was the testimony of, some could argue, a self-interested attorney. Whereas here, as you said yourself, millions of documents, years of protracted litigation, and your position is still that the district court just didn't have in front of it and therefore didn't properly review enough of the evidence to reach this conclusion? That's exactly right. Rule 23E was amended to require front-loading. In the language of the commentary, it says you have to have a solid record. The proponents, when they offer what they call the biggest antitrust settlement in private history, they don't present any of that evidence, Your Honor, notwithstanding 75 million documents. There's not a single financial record, although they created a structured database. Any other questions? Would you like me to call a stand? I would. Mr. Behenna? Not sure why. Good morning, Your Honors. Good morning. My name is David Behenna. I'm a non-attorney class member representing myself pro se. I traveled from Ribey to New Hampshire to present my oral arguments. I'll be addressing three topics. The district court's incorrect legal analysis for determining a reasonable attorney's fee. Its use of a mathematically incorrect calculation to justify the requested attorney's fees. The bifurcated analysis, it seems to me, was never raised in the district court, and you can't raise it for the first time on appeal. The calculation was not correct? The bifurcated analysis issue that you raised was not raised in the district court. You can't make that argument for the first time on appeal, I don't think. Well, Your Honor, my objection to the court, I objected to the use of its right, I can find the site, I objected to the use of not, the court not using the load star for the injunctive relief. Where did you raise that in the district court? I understand that your argument here, right, is that the district court erred by failing to do a separate analysis of the attorney's fees billings related to injunctive relief and billings related to monetary damages. Where in the record does it show that you presented that argument to the district court? It's going to use up my time, I'd have to get my binder on it. Just describe it for me. In my written objection to the district court, I said that the district court should have used the load star method with respect to the plaintiffs prevailing on their injunctive relief claims. Yeah, but you didn't say that there should be a separate analysis for injunctive versus damages, it seemed to me, which is the argument you've been making here. Well, I can only say that it seems to me I dropped, you know, I said the court should have used the load star method. I also said it should have used the load star method for the common fund approach, but I did not. You didn't say, though, common fund only for damages, load star only for injunctive relief. You didn't make that argument in the district court that you presented in your brief to us. Well, I believe I came at it halfway, maybe not 100%. Okay. But by putting it clearly in black and white in my objection, Your Honor, I have a different view as to whether or not I actually addressed it bifurcated fee or not. So by not objecting to or not appealing the common fund approach, that automatically, I would say, creates the bifurcated approach because I am not appealing the common fund approach. I am disputing, though, whether the percentage applied was correct. Would you agree, sir, that according to the district court and I think general case law, that about 25% of the settlement amount is what is generally allowed for attorney's fees and that in this case the court actually awarded less than that? And if that is true, then how is it that the attorney's fees are excessive? Okay. In Camden 1 condo, which I think was a 1991 case in the circuit, it was found that 20% to 30% was a general range. That was based on the Johnson factors. That was based on the 12th Johnson factors using judge, excuse me, professor. There were two professors in the Third Circuit. They relied upon their fee studies to come up with that. And the language from Camden 1 was basically a majority of these cases fall in this range. However, you have to look at the facts of the case to determine whether this is reasonable or not. And under Johnson 1, in this case, under Johnson number 12, Professor Fitzpatrick, actually for the plaintiff, showed that the typical fee in mega fund cases this size, the median fee is around 7.7%. So under Johnson 12, the benchmark should have been adjusted down. It should have looked at it adjusted down. The second major issue was the performance. The $2.67 billion common fund on its face is a very impressive recovery. However, when you look at the $36 billion in claims, the plaintiff's experts showed the actual recovery is closer to 7.4 cents on the dollar. Okay. Mr. Behena, you've saved some time for rebuttal. You can sit up here with counsel if you like. Okay. Thank you. Mr. Cochran. Good morning, Your Honors. George Cochran for Appellants Jennifer Cochran and Aaron Craker. Let me set the stage for your questions. Though residuals must be shared in an equitable and economic fashion, class plaintiffs, including employers, violate both with the employee's unclaimed funds in order to enrich employers' and employees' expense. Not only does this violate the settlement's own standard, it violated Rule 23's equitable treatment requirement, and ultimately even ERISA. Employees are told there's no need to inform employees, while employees are told there's no need to hire a lawyer, since colleague counsel is working on your behalf. The Secretary of Labor, our ERISA champion, sounds the alarm. Why? Because he knows employees will be sacrificed at the altar without their own lawyer. He warns this conflict of interest will enable employers to breach their duty of loyalty as named fiduciaries. It may even be a prohibited transaction. Therefore, there is no conceivable justification, in our opinion, for employers to obtain recoveries attributable to employee contributions. Instead, he urges appointing separate representation before it's too late. Class counsel admits this very technical issue is completely unsettled, but there's no need to worry, since ERISA is not part of the deal, and the employer's fiduciary duties still apply. Accordingly, there's no restriction on spending the money or mechanism to ensure they comply. The district court's order approving the settlement, as I understood it, stated expressly, all ERISA duties still apply, and all ERISA fiduciaries must comply with those duties, right? Yes. Okay. And the fatal mistake was concluding, as a legal error, that there is no impact on the employee's ERISA rights. If an ERISA plan or employee believes that an employer has used the settlement proceeds in a way that violates ERISA, they retain the right to sue under ERISA. It seems to me nothing in the settlement agreement would affect that right. Well, Your Honor, I think the problem is the mistake of law into thinking that ERISA, there has been no violation right now. Let me go through the steps quickly for you to prove that. First question is, are these plan assets or not? Well, starting off, all funds contributed by employees to a welfare plan are plan assets, whether they're held in the plan or not. More specifically, a rebate of employee contributions is a plan asset if the plan has a beneficial interest under ordinary notions of property rights. According to ordinary property rights, a plan that holds a future interest in contractually owed contribution owns the asset now as a chosen action. In our case, the settlement agreement reduces the group's premium overcharges to stipulated amounts that are contractually owed to employees and or the plan. Now, while abandoning this benefit may forfeit the employee's present interest in the funds, steering them to the employer was the mistake because it gives the employee a future interest in that asset as a plan beneficiary. That status never changed. There's still employee contributions. In other words, the employee's unclaimed overcharges were repurposed as plan assets by assigning them to their employer. If the parties really wanted to avoid ERISA, they should have retained all unclaimed funds, as they did with employer unclaimed funds, in the common fund for pro rata distribution to all claimants after paying valid claims and expenses. Second step, so what? It's a prohibited transaction. Plan assets are to be held exclusively for the employee's benefit. We all agree with that, especially not to the employer's benefit. ERISA prohibits transactions between the plan and a party in interest. Well, employers are parties in interest, including, by the way, the employer representatives. That's key. Okay, Mr. Cochran, I think we understand your case. That's why it's a present crisis, not a future problem. The employer representatives caused the plan, their own plans, to violate ERISA through a prohibited transaction by signing the settlement itself. It's a present problem. All right, well, you've saved a minute for rebuttal. Let's hear what opposing counsel has to say. Thank you, Your Honor. Mr. Cooper. Good morning, Mr. Chief Judge, Judge Abadou, Judge Barber, Charles Cooper for the appellees here. With the Court's permission, I'm going to be dividing argument with my colleague, my co-counsel, David Boies. I'm going to address the Home Depot and the HENA appeals. Mr. Boies will address the topographic and Cochran appeals. Let me speak first to the Home Depot appeal and this argument that public policy categorically forbids the kind of continuing conduct release that is before you in the transaction settlements for a long time and has been upheld specifically by this Court in at least two controlling cases. There are four problems with Home Depot's argument, this particular argument. First of all, no case mentions, let alone upholds, this supposed public policy ban on continuing conduct releases. Riddell's is very distinguishable. As I mentioned just now, two cases from this Court actually uphold releases indistinguishable from the one before you. And managed care, in re-managed care, rejects the very public policy argument that Home Depot advances here today in the context of establishing the identical factual predicate, guardrail we call it, for approving and enforcing settlements in class action cases. You don't have an objection to us construing this settlement, do you, as releasing all claims related in any way to the identical factual predicate? We do not, Your Honor. We think that's the governing standard. That's the standard. And that that's what the text of the settlement provides. The text of the settlement provides that, and the parties made it clear that quite apart from the text of the release itself, what the parties were trying to do was to extend the release to the fullest extent permitted by the law, but not one step beyond that. And I would also point the Court to the whereas clauses, where on page 2, the parties clearly indicate that their intention is quite consistent with what you've just outlined, Your Honor. Can I jump in real quick? I mean, there's a lot of discussion in here about private enforcement, private enforcement, and there's a footnote or two or three sentences maybe about governmental enforcement. Am I correct that irrespective of all of this, if this was a real, real big problem, somebody at the Department of Justice or our very able State Attorney Generals could come into this and go after the blues for antitrust violations? Could that happen? Your Honor, the blues practiced these ESAs, we call them, and there are other practices openly for decades and decades without any challenge by public enforcement authorities or by private plaintiffs. But there's nothing about the release in this settlement that would prohibit the public authorities from enforcing the antitrust laws? And nothing about the release that binds them in any way? I don't know how it could. I don't know how it could release their claims if they're not parties to the settlement. There are, you know, anyone who's not a member of the class at all. And even the opt-outs, Your Honor, it is clear from these releases that the only thing they're to seek not only trouble damages, but also any individualized damages, such as seeking additional blue bids. All the ASOs are free to do that in their opt-out litigations. Your Honor, I would like to make one point that didn't come through clearly, I don't believe, in our briefing. And that is I think this public policy argument is very difficult as well to square with the Supreme Court's decision in American Express against the Italian Colors Restaurant. In that case, I'm sure the Court is familiar, the Supreme Court upheld an arbitration clause that prohibited class action arbitrations. And so the claim was that that violates public policy because that will exclude all, essentially all antitrust claims from being litigated because of the overwhelming cost of an individualized arbitration wouldn't be worth it. The Court rejected the public policy argument that class-wide relief was necessarily available as a public policy matter. Here, Your Honor, the only thing that the objectors are prevented from seeking is class-wide relief, just essentially like the plaintiffs in the Italian Colors case. I'll turn my attention, if there are no further questions about the release, to the arguments offered by Home Depot that the representation of the plaintiff class, of the subscriber's class, was inadequate. They say, first, that it was inadequate as an inter-class matter, focusing just on the B-2 class, because it was their inherent conflicts in a B-2 and a B-3 class. Your Honor, not only, again, as there has never been a case that supports it, the very case that they placed their primary reliance on, payment card, in Ray, payment card interchange fee, rejected unequivocally precisely that argument when it said that after going through the glaring conflict that it did seek. Well, I mean, when the classes are virtually identical, it doesn't seem to me that that argument can work very well. Your Honor, that's the whole answer to it, and a payment card rejected the notion that there's a categorical ban saying none of this is to say that a B-3 and B-2 class is necessarily and always requires separate representation. Problems arise when the B-3 and the B-2 classes seek distinct relief, have non-overlapping membership, and are certified as settlement-only. We check only one of those boxes. This is a settlement-only class, but the other two, Your Honor, we do not check, and that makes, that's the full answer. Well, what is your response to, I guess, opposing counsel's position that for purposes of the distribution, there was insufficient evidence in the record to support the district court's approval of that distribution? Your Honor, I think that's topographics, our argument that they're advancing. Okay. I'm sure he'll address that the moment he comes to the podium.  If I can dodge that question, Your Honor. Thank you. Thank you. Mr. Chief Judge, you mentioned the intra-class. There is no fair reading of their opening brief. That would have alerted us that this was coming. I'm sorry. That claim was forfeited. But if the court exercises its discretion to reach that claim, it should reject it. The notion here is that within the B-2 class, there were factions within it. Who knows how many? They identify four factions within it with naturally divergent priorities. And so the subclassing requirements, the fragmentation requirements, if you're going to subclass and separately represent, everyone in our class with naturally divergent priorities is a recipe for chaos. I see my time is up, Your Honor. Thank you. Thank you, Mr. Cooper. Mr. Boyce. Thank you, Your Honor. May it please the Court, my name is David Boyce. I think I previewed for you, Mr. Boyce, my question. You got a little bit advanced preparation time. Thank you. And I'll begin by addressing your question about the 6.5% distribution. First, the record is undisputed and the district court found that this was the product of months-long, intensive, arm's-length negotiation. Second, it was supported not merely by the opinions of counsel. It was supported by both Dr. Mason, who was representing the self-insured class. It was represented by Dr. Peckis, who did an analysis. Dr. Peckis came out with a percentage that was 3.4%. It's in the record. Dr. Mason came out with four different analyses, all consistent with the 6.5% analysis. The appellants only talk about the first one, but there were three other analyses that Dr. Mason did, all supportive of the distribution percentage. This was then looked at by Ken Feinberg. It was looked at by the special master, Mr. Gentle. It was looked at by the court. The court went through a whole series of factors justifying it. The court made findings about, for example, that the fully insured business was four to ten times more profitable than the so-called ASO business. Not a single ASO had sought to file suit at any time. The ASO's business was, in fact, sometimes at a break-even or even a lost leader. The evidence that they bring in from the Anthem case about margins is totally inopposite here. The margins have nothing to do with the case. Just a second. Let me interrupt that point before you go too far down that line. This idea of ASO's, you know, in antitrust cases, we talk about usually geographic market, product market. How did the ASO's get into the case? It's not clear to me from looking at this. I mean, why wasn't it just parceled out as a different product market? The ASO's, in some senses, are a different product market, Your Honor. At the end of the negotiations, there was a discussion about whether the case would include the ASO's or not. From the beginning, the ASO's were not included. There was a suggestion here that the ASO's were in from the beginning. That is simply factually not true. The district court found that that was not true and found it was not true on a lot of bases. I mean, for example, they talked about the service. I think when you read the pleadings and read the record, it seemed that there was ample support for the notion that they arrived later. Yes, Your Honor. That was, again, one of the aspects for why the 6.5% was justified. But once the ASO's came into the case late, a separate counsel was appointed for them to represent. An expert was retained by them. The expert that they brought in testified that he didn't think that distribution should have anything to do with overcharges. The amount of the overcharge was obviously critical to the amount of the distribution. That's what both Dr. Mason, Dr. Pecos, Mr. Feinberg, Mr. Gentle all concluded. Their expert said he didn't think the amount of the overcharge had anything to do with the amount of the distribution. That, we respectfully suggest, is simply wrong as a matter of both of economics and law. The court found that the so-called ASO market was much more competitive, which would mean that the overcharges would obviously be lower. But my understanding of their argument is that they didn't have access to the information. The district court didn't have direct access to the information. Therefore, it was not reliable or that it was improper for the district court to just, it sounds, blindly rely on the evidence or the information that the experts provided. Again, if I'm understanding their argument correctly. I think that is their argument, Your Honor. But this was an arm's-length negotiation. This was not a trial. The issue in terms of an arm's-length settlement was not to determine the facts de novo. It was to determine whether the settlement was reasonable or not. The only cases that they cite, like the Holmes case, as the court indicated earlier, has nothing to do with this. That was a situation in which eight class members got half and the other 118 got the other half. And the ones that got the eight were the class representatives. And in that case, 30 percent, more than 30 percent of the class objected. Here, approximately one thousandth of one percent of the ASOs are objecting here. Two out of 170,000 class members. So you couldn't have a situation more different, I would respectfully suggest, than the Holmes case. Let me just talk briefly about the Coughlin appeal. What they're saying is that somehow this is an ERISA violation. The district court made absolutely clear that this settlement does not release any ERISA things. The Department of Labor intervened. They did not object. They did not appeal. Thank you, Mr. Boyce. Thank you. Ms. DeMasi? May it please the court, I'm Karen DeMasi on behalf of the defendant, Apolise. And I wish just to briefly address the issue of the release. As an initial matter, I want to underscore that this settlement would not have happened without this release. This is the consideration that the defendants received in this settlement. And this court's jurisprudence on the issue of the release can be distilled into a single principle. And that is that ongoing conduct related to an identical factual predicate may be prospectively released. That's Bennett, right? That's Bennett. Brand new and different conduct may not. And that explains the Home Depot cases that they cite, both Rettles and Lawler, related to separate and different conduct. And that was what was at issue in those cases. The only other principle I want to address here is the public policy issue. There are actually two public policy issues present here. The first is the private enforcement of antitrust suits, which we've discussed and is plainly present. But there is also a strong public policy in favor of class action settlements. And those policies here, those public policies, are not in conflict. They're in harmony. Unless the panel has other questions, I'm happy to rest on our papers. Thank you, Mr. Massey. Mr. Lowery. Thank you, Your Honor. Judge Barber, the ASOs were added to the case at the very last minute at the solicitation of the settling parties. There's no dispute they're in a different market. That's because the Blues wanted them in the case to buy a bigger piece. And we just heard, no lease, no money. The fully insured, localized employers get $2.6 billion if they deliver this release. What's the problem with that? The problem with that is they are the only B-2 representatives. The self-insured national employers are buried in a B-2 class and have no voice. And no one, not the district court, not today in court, not in the motion to strike, no one has ever explained why that's okay. No one has ever explained why those two entities don't have different relative priorities given the national account allocation rules that apply only to national accounts. What do you say, just a second, what do you say, the amici brief here that was filed on page 5, the only thing Home Depot or other opt-outs cannot do is seek an injunction on behalf of others. In other words, what are you complaining about? Well, so two things. First of all, if you believe that's what the release says, please say that. Because the Blues will say entirely different things in litigation. So that's thing one. Thing two, the public cares. The Supreme Court has been very clear that the prying open of markets that are closed, broad market-wide relief is exactly the kind of antitrust relief that's most important to public policy. And so you're not doing it for us, you're doing it for the public policy. And by the way, Lawler and Riddell's were both continuing conduct cases. They govern. It doesn't matter what has been said since then. You have to follow those cases. Those cases would have turned out differently, both of them, if what they're telling you the law was today is in fact the law. You asked about government enforcement, Judge Barber. Both Lawler and Riddell's, that could have been an answer there too. But both said no, even the release of one private plaintiff's ability to seek remedies violates legislative policy. They're releasing 800 million potential plaintiffs in this settlement. I know time is short. I would love to speak to anything that's burning on your mind, anything where I might have a chance to satisfy you. I've left plenty of time up here before on prior arguments, but I'm not sensing a lot of bite on that, am I? No, I don't hear it. But we appreciate the offer, Mr. Lowry. Mr. Smith. Thank you, Chief Judge Barber. Quickly, referring to the 2016 discovery that was done by the Blues, that hasn't been spoken to by them, but this is what they said at the time. The alleged injunctive class has nationwide implications that impact every Blues subscriber, big and small, including self-funded members. That is why we, the Blues, subpoenaed and the court allowed discovery from self-funded subscribers. If we were in the class in 2016 to sit for depositions that they used in their summary judgment briefing, we were in the class all along. Now, just because you need discovery from individuals doesn't mean you're in the class. Well, they said these were absent class members. They knew that all 103 million members of subscribers were needed to tear down these geographic restrictions. Mr. Boyce has offered that Dr. Mason was— Would you agree with me that we can look at the pleadings to determine who's in the classes? Yes, Your Honor. Okay. The definition from Servant is identical to the definition in the first admitted complaint, which was filed in 2014. With the four-year look back, that takes you to 2010. But when there's no difference in the definition of the two classes, it takes you all the way back to Servant. The other thing I would say is that none of these rationalizations by Dr. Mason were offered in support of the allocation and were they relied on by the district court. Thank you. Thank you, Mr. Smith. Mr. Pena, do you have anything? Just to add a document reference, Your Honor, the plaintiffs did not address my appeal over and above your comments. Just to say that— And that's a good point. I don't know that we need any rebuttal then, do we? I was asked to read document 2812-20 in volume 15 where I specifically say in writing there that the injunctive relief deserves a lodestar. And in this court, in the Home Depot customer, that is a true case. It mentions that parties are allowed to weigh position in issues on appeal as well as offer new arguments and case citations in support of a position advanced in the district court. So what I'm saying is the word bifurcated may not have been used in the district court, but by me saying in my objection the whole lodestar should be treated as the lodestar— Okay, Mr. Pena, we'll take a look at that filing. I appreciate it. Mr. Cochran. Your Honors, this is not a problem for tomorrow. It's a crisis today. The refusal to appoint separate counsel for employees and the failure to see that these funds are planned assets formed a perfect storm for abuse of discretion. The court certifying class as an interclass conflict that enriches employers at employees' expense, violates Rule 23's mandate to treat class members equitably, ignores the employer's obligation to handle planned assets for the employee's benefit, assures employees there's nothing to worry about, and then gives employers the freedom to violate ERISA. In fact, the employer representatives engaged in a prohibitive transaction by signing the settlement agreement. Instead of kicking the can down the road, this tragedy could have been easily avoided by simply earmarking the funds for the plans or distributing them pro rata to all claimants. Instead of trusting employers to do what's right, millions of employees are counting on you to make it right. Thank you. Thank you. We are adjourned for the week.